UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BARBARA AARONS,

                                Plaintiff,

                 -against-

CAROLYN W. COLVIN, COMMISSIONER OF
SOCIAL SECURITY,

                                Defendant.
-------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/21/15__

14-cv-04343 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

        Plaintiff Barbara Aarons challenges the final decision of the Commissioner of

Social Security (the "Commissioner") concluding that she is not eligible for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.*, or

Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*

Plaintiff asserts that the determination of an Administrative Law Judge ("ALJ") that she is not

disabled within the meaning of the Act was erroneous, not supported by substantial evidence,

and contrary to law.  (Compl't ¶¶ 13-14.)  Specifically, plaintiff argues that the ALJ (1)

improperly applied the treating physician rule; (2) improperly failed to obtain testimony from a

vocational expert; and (3) made a finding on her residual functional capacity ("RFC") that was

not supported by substantial evidence.  (Pl. Mem. 12.)

        Defendant has moved for judgment on the pleadings under Rule 12(c),

Fed. R. Civ. P. (Dkt. No. 10.)  For the reasons set forth below, the Court concludes that the

ALJ's decision is supported by substantial evidence and is based on a correct application of the

law.  The Commissioner's motion is therefore granted.

1

I. PROCEDURAL HISTORY

Plaintiff applied to the Social Security Administration ("SSA") for disability benefits on March 7, 2013. (R. 98.) Plaintiff later protectively filed for SSI benefits on July 1, 2013. (R. 14.) In both applications, plaintiff claimed that, beginning on July 1, 2010, she became unable to work due to a disabling mental condition. (Id.)

The SSA initially denied plaintiff's claims in a letter dated June 22, 2013. (R. 110-13.) Plaintiff subsequently requested a hearing before an ALJ. (R. 114-15.) A first session took place before ALJ Brian Lemoine on August 23, 2013. (R. 28-47.) Plaintiff appeared without legal representation. (Id.) ALJ Lemoine informed her of her right to be represented at the hearing. (R. 30-32.) Plaintiff indicated that she would prefer an adjournment to have a representative appear on her behalf, and the hearing closed without any testimony taken. (R. 38-47.)

At the December 6, 2013 hearing before the ALJ, plaintiff was represented by counsel. (R. 50.) She testified about her age, educational background, work history, daily activities, family ties, social life, medical history, and physical and psychiatric condition. (R. 52-81.) Plaintiff's brother, Jeffrey Aarons, also testified. He described his sister's living conditions, interpersonal problems, and difficulty working, as well as a single suicide threat made by her. (R. 82-95.)

In addition to the hearing testimony, the ALJ reviewed documentary evidence, including (1) medical records from the Rockland County Department of Mental Health (R. 470-515); (2) psychiatric evaluations and treatment notes from plaintiff's treating psychiatrist Dr.

Gerardo Posada (R. 327-33, 336-37, 499, 425-33, 529); and (3) a consultative examination report by Dr. Taina Ortiz. (R. 354-58.)

In a decision dated January 6, 2014, the ALJ found that plaintiff was not disabled within the meaning of the Act. (R. 14-23.) Plaintiff sought review of the ALJ's decision by the SSA Appeals Council, but the Appeals Council denied review, in a letter dated April 17, 2014. (R. 1-3.) This made the ALJ's ruling the final decision of the Commissioner on plaintiff's application. Plaintiff then filed this action on June 17, 2014. (Dkt. No. 1.) The Commissioner moved for judgment on the pleadings on January 21, 2015. (Dkt. No. 10.) On February 20, 2015, Plaintiff, through counsel, filed a Memorandum of Law opposing the Commissioner's motion.[1] (Dkt. No. 12.)

## II. EVIDENCE BEFORE THE ALJ

As noted, the evidence before the ALJ consisted of the testimony of witnesses, medical records, evaluations, and reports. The record is summarized below.

### a. Non-Medical Evidence

#### i. Plaintiff's Testimony

Plaintiff was born on April 28, 1954, and she has a college degree in business administration. (R. 52-53.) She lives alone rent-free in her childhood home, which she inherited from her parents. (R. 53.) She testified that she has no friends and does not attend social gatherings, apart from sporadic trips to religious services "once in a while if [she] feel[s] up to it." (R. 74.) She talks to her brother weekly, but has little or no contact with other family members. (R. 74-75.) She spends most of her time watching TV at home. (R. 63.) She shops,

---

[1] Initially, plaintiff asserted that "the Commissioner failed to file pages 166 to 200 of the Certified Administrative Record." (Pl. Mem. at 1.) Those pages were filed and the issue was resolved. (Def. Reply Mem. at 1 n. 1.)

cleans, and cooks for herself, and she manages her own calendar, including scheduling appointments with doctors. (R. 75-6, 78.)

In the early 1990s, plaintiff began work as a self-employed telemarketer, selling advertising space for and to various companies, on a commission basis. (R. 54-55.) For some 5 to 10 years, plaintiff's brother supervised her telemarketing work. (R. 57.) In 2008, plaintiff stopped working in the telemarketing industry because of her mental health issues. (R. 57-58.) Specifically, she became less productive and generally unable to handle the work due to her problems with depression and anxiety. (Id.) She reported attempting to re-enter the telemarketing world, but because of her lack of technological skills, she felt unable to perform what is now a largely computerized job. (R. 58.)

At the time of the hearing, plaintiff was working part-time, and on a per diem basis, as a companion to elderly individuals. (R. 59, 61.) She reported that she works, on average, less than 20 hours per week, and some weeks she works as few as 5 hours. (R. 59.) She also reported refusing work assignments on days when she does not feel "up to it." (R.80.) When she does work, plaintiff drives to her assignments, all of which are located a short distance from her home. (R. 75.) She listed several job duties, including accompanying clients to shop for food or attend a doctor's appointment, performing light housework, and preparing simple meals. (R. 61.) At the hearing, plaintiff testified to receiving complaints from clients about her manner and demeanor, typically because she "say[s] inappropriate things," can be "overbearing," and generally appears "nervous" and tense. (R. 62.) She testified that she could not work full-time due to her various mental health problems. (R. 73-74.)

Plaintiff testified in some detail about her mental illness and medical treatment. Since at least 1999, following the death of her father, plaintiff has been receiving medical care—primarily medication management—at her local mental health clinic, the Robert L. Yeager Health Center (the "Health Center"), a division of the Rockland County Department of Mental Health. (R. 64-65.) Plaintiff testified that she suffers from anxiety disorder, major depression, obsessive-compulsive disorder, mood disorder, and personality disorder. (R. 68.) Plaintiff also reported experiencing sleep difficulty and fatigue. (R. 63-64.) She stated that she takes Trazodone, Ativan, and Celexa—to manage her mental impairments—and has been doing so for almost 15 years, with only "minimal" side effects. (R. 64, 79.) During the year leading up to the hearing, plaintiff was under the care of Dr. Gerardo Posada. (R. 68.)

Plaintiff also suffers from borderline diabetes and high cholesterol (R. 63), but her "functional report," which she filled out for the SSA, describes mental impairments as her only limitation. (R. 223.)

Over the years, plaintiff has met with various psychiatrists, typically every three months and usually only for medication management. (R. 66, 78.) Plaintiff testified to only recently receiving weekly psychotherapy. (R. 70.) She attributed the lack of earlier and more consistent therapy to lapses in her health insurance coverage (id.), and to the Health Center's limited resources. (R. 66.) Plaintiff also recounted her basic symptoms, including irritability (R. 81), stress and fatigue (R. 64), and feeling "low." (R. 74.) Additionally, plaintiff reported frequent arguments with others, including her brother. (R. 80.)

ii.  Witness Testimony

In the course of his testimony, plaintiff's brother, Mr. Aarons, described a typical day in his sister's life, noting that she can have trouble "getting going" in the morning, and keeping appointments. (R. 83.) He also described his sister's living conditions, stating that her house, though not "in shambles," is not well kept. (R. 84.) For example, Mr. Aarons reported that the "kitchen table is filled with papers," and plaintiff tends not to "throw things out." (Id.) He also discussed plaintiff's problems interacting with others, including his girlfriend, and he talked about his experience as plaintiff's supervisor at a telemarketing company. (R. 85-87.) Specifically, he stated that plaintiff had difficulty remaining focused at work, which negatively impacted her productivity (R. 87), and she had difficulty getting along with co-workers. (R. 88.) The witness deemed his sister's presence at the company a contributing factor to its demise. (R. 89.)

Mr. Aarons also discussed a suicide threat that his sister made about two months before the hearing. (R. 91.) He personally did not think it to be a serious threat but did not consider himself qualified to judge the seriousness. (R. 95.) He noted that responding officers took plaintiff to a crisis center, but she was released into his custody within hours. (R. 93-94.)

b.  Medical Evidence

The ALJ reviewed plaintiff's medical records, including the records of Dr. Gerardo Posada, who provided plaintiff with ongoing mental health care during the year leading up to the hearing. (R. 18-19, 21-22.) The treating records reviewed included an outpatient psychiatric evaluation (R. 336-37), a narrative-style psychiatric assessment (completed for the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations) (R. 327-33), a "check-the-box" style psychiatric impairment questionnaire

(R. 425-33), and an outpatient medical progress note. (R. 529.)  Additionally, the ALJ

considered the report of a consultative exam conducted by Taina Ortiz, Psy. D.  (R. 354-58.)

i.   Treating Psychiatrist's Records

On March 28, 2013, Dr. Posada performed a psychiatric evaluation of plaintiff.

(R. 336-37.)  He noted that she held down a part-time job while receiving treatment for major

depressive disorder, recurrent type, and anxiety disorder, not otherwise specified (NOS).

(R. 336.)  He also noted that plaintiff was taking mental health medications with "fair results"

and without side effects.  (Id.)  Indeed, plaintiff reported that her medication "helps her with the

anxiety and stress of her job."  (Id.)  Plaintiff denied insomnia and irritability.  (Id.)  And she

denied ever being psychiatrically hospitalized.  (Id.)  Finally, plaintiff described her medication

management schedule (40 mg Citalopram, 50 mg Trazodone, 1 mg Lorazepam), stating she

"attends appointments every 3 months because she is stable and wishes to keep it like that."  (Id.)

Dr. Posada also performed a mental status evaluation at the March 28 session.

(R. 337.)  He noted that plaintiff had an anxious mood and restricted and dramatized affect, and

that her judgment was impaired and her insight poor.  (Id.)  Dr. Posada confirmed the earlier

diagnosis of major depressive disorder, recurrent, and assessed personality disorder, NOS, as

well as a Global Assessment of Functioning (GAF) score of 59.  (Id.)

On May 16, 2013, plaintiff returned to Dr. Posada "to get her disability papers

filled out."  (R. 499.)  After meeting with plaintiff, and deeming her psychiatrically "stable"

(R. 499), Dr. Posada prepared a lengthy, narrative-style medical source statement detailing her

symptoms, treatment and response, presenting problem, clinical course, mental status, and

overall functioning.  (R. 327-33.)

First, Dr. Posada listed plaintiff's "current symptoms." He noted, "patient reports limited concentration, sad and blue affect, recurrent anxiety, feelings of emptiness, dysphonic mood, [and a] low level of energy." (R. 327.) He further noted plaintiff's "lack of joy in simple life/leisure activities," as well as her "limited social interaction." (Id.) Dr. Posada assessed major depressive disorder, and personality disorder, NOS. (Id.)

Next, he documented plaintiff's extended treatment history. Specifically, he noted that plaintiff had attended appointments at the Health Center for the past 14 years, but was never psychiatrically hospitalized. (R. 328.) Additionally, Dr. Posada deemed plaintiff psychiatrically stable during the past 5 years, even though she "demands constant reassurance/attention." (Id.) He indicated that plaintiff presented primarily with "symptoms of depression and anxiety" that appeared "exacerbated and perpetuated" by relationship-type stressors, such as "getting along with co-workers, friends, and family." (R. 329.) He further noted that plaintiff feels "neglected, abandoned, and mistreated by her friends and relatives." (Id.)

In detailing plaintiff's "clinical course," Dr. Posada noted her "ups and downs" over the years, but emphasized that she received exclusively outpatient care. (Id.) He noted plaintiff had taken the same medications "for at least 12 years with fair results." (Id.) In describing his mental status findings, Dr. Posada noted that plaintiff, despite displaying an anxious mood, behaved calmly and showed "no psychomotor agitation." (R. 330.) Her speech was well articulated and delivered at a normal rate. (Id.) Plaintiff's affect appeared constricted but appropriate, and she experienced no auditory or visual hallucinations. (Id.) She was "awake and alert" upon examination, and her memory was "intact." (Id.) She was fully

oriented, her information level was "appropriate," and she displayed a "good" ability to perform calculations. (Id.)  Only her insight and judgment appeared "limited."  (Id.)

Finally, Dr. Posada assessed plaintiff's overall functioning.  (R. 331-32.)  He indicated that she had an "intact" ability to maintain activities of daily living, noting that she remained capable of caring for herself.  (R. 331.)  He remarked that plaintiff maintained the ability to work part-time, but described certain limitations in her ability to function in a work setting, most notably her difficulty "getting along with people" and accepting supervision, which he attributed to a "passive-aggressive" personality and the fact that she "easily gets offended." (Id.)  He also noted plaintiff's self-reported concentration issues and "limited attention span." (R. 332.)  Despite these limitations, however, Dr. Posada opined that plaintiff could "function in a very restricted almost 'isolated' work/job environment . . . doing activities [that do not] demand high concentration or [a] high stress level, with limited social interaction or supervision."  (R. 331.)   He further opined that plaintiff would "function more appropriately in a very structured [work] environment" with "well defined responsibilities."  (R. 332.)  He concluded by noting: "patient requires extensive psychotherapy and possibly a more psychodynamic approach."  (R. 333.)

On September 4, 2013, plaintiff again was seen by Dr. Posada, who noted plaintiff's frustration, anger, and irritability at having her disability benefits claim denied. (R. 494.)  Dr. Posada further noted that plaintiff attended appointments "every three months for medication *only*," rejecting "individual therapy intervention."  (Id.)

Also on September 4, Dr. Posada completed a "check-the-box" style psychiatric impairment questionnaire.  (R. 425-33.)  He confirmed a dual diagnosis: major depression,

recurrent, and personality disorder, NOS. (R. 425.) He also noted that plaintiff's GAF score ranged from 55-60 over the past year, and was currently 59-60. (Id.) At this time, Dr. Posada gave plaintiff a "fair" prognosis, and he acknowledged his "limited" exposure to her case, remarking that he had seen plaintiff just a handful of times since his initial evaluation. (Id.)

In completing the psychiatric impairment questionnaire, Dr. Posada "checked off" numerous abnormal clinical findings, including: oddities of thought, perception, speech or behavior; sleep disturbance; personality change; social withdrawal or isolation; "emotional lability"; decreased energy; anhedonia or pervasive loss of interests; persistent irrational fears; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating; hostility and irritability; and pathological dependence or passivity. (R. 426.) Dr. Posada also noted that plaintiff had never been hospitalized nor required emergency treatment for her mental health problems, save a single brief stay with the Health Center's crisis team "due to suicidal ideation but no plans." (R. 427.)

Dr. Posada also documented plaintiff's symptoms, most of which he deemed related to depression. (Id.) Specifically, he listed the following primary symptoms: irritability; relationship difficulties; anger; and withdrawal and isolation. (Id.) Additionally, he deemed plaintiff's "personality" problems "severe" to the extent that she "puts herself in situations in which she is 'victimized,' rejected, or simply 'not validated' by others." (Id.)

Dr. Posada then indicated—by "checking" boxes—that plaintiff had "marked" limitations in the following areas:[2]

---

[2] According to the form, "markedly limited" means the individual lacks the ability to perform "the activity in a meaningful manner," while a "moderate" limitation "significantly affects but does not totally preclude the individual's ability to perform the activity." (R. 428.)

Ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; ability to work in coordination with/or proximity to others without being distracted by them; ability to interact appropriately with the general public; ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or make plans independently.

(R. 429-31.) Dr. Posada next indicated—again by "checking" boxes—that plaintiff was only "moderately limited" in terms of her understanding and memory (R. 428), as well as most areas of "concentration and persistence" (e.g., carrying out instructions, "maintaining attention and concentration for extended periods," and making "simple work-related decisions"). (R. 429.) Additionally, he checked a box signaling that plaintiff "experiences episodes of deterioration or decompensation in work or work-like settings which cause [her] to withdraw from that situation and/or experience exacerbation of signs of symptoms." (R. 431.) He "checked off" that plaintiff was "incapable of even 'low stress'" work, was likely to experience good days and bad ones, and would likely miss work more than three times per month. (R. 432-33.)

On October 21, 2013, plaintiff returned to Dr. Posada. (R. 529.) At that time, Dr. Posada recorded plaintiff's continued "interpersonal" problems, but noted improvement in her condition in general. (Id.) Specifically, plaintiff reported feeling "less irritable and anxious," and she reported sleeping better at night. Further, plaintiff expressed willingness to re-start individual therapy. (Id.) Dr. Posada again deemed plaintiff "psychiatrically stable." (Id.) He noted that she was "not a danger to herself or others," displayed no suicidal or homicidal ideas or plans, and continued to take her medications without issue. (Id.) Moreover, Dr. Posada's mental status examination revealed a goal-directed and productive thought process, a euthymic mood, a

constricted but appropriate affect, and normal speech. (Id.) Significantly, Dr. Posada noted "no evidence of severe depressive or anxiety symptoms." (Id.)

### ii. Non-Treating Psychiatrist's Report

On May 31, 2013, Dr. Taina Ortiz performed a consultative psychiatric evaluation on plaintiff. (R. 354-58.) Plaintiff reported difficulty sleeping, appetite changes, and long-standing symptoms of depression, but reported "no history of psychiatric hospitalization." (R. 354.) Plaintiff also described symptoms of anxiety, including "excessive worrying, restlessness, [and] nervousness." (R. 355.) And she complained of "panic attack symptoms"— for example, "trembling"—but failed to elaborate. (Id.) Further, plaintiff reported "memory difficulties." (Id.)

Dr. Ortiz performed a mental status examination, during which plaintiff was "cooperative," displaying "adequate" social skills. (R. 355.) Dr. Ortiz noted that plaintiff's appearance was normal, her speech was "fluent," "clear," and "adequate," her thought process was "coherent and goal directed" with no signs of "hallucinations, delusions, or paranoia," and her affect was "of full range and appropriate in speech and thought content." (Id.) Dr. Ortiz further noted that plaintiff had a neutral mood, that she displayed "intact" attention and concentration skills, and that her memory skills were "[m]ildly impaired due to distractibility." (R. 356.) Dr. Ortiz did assess poor insight and judgment, but she noted plaintiff had average intellectual functioning. (Id.) Dr. Ortiz assessed depressive disorder, NOS, anxiety disorder, NOS, and personality disorder, NOS. (R. 357.) She rendered a "guarded" prognosis. (Id.)

In describing her day-to-day functioning, plaintiff stated that she is able "to dress, bathe, and groom," that she can "cook and prepare food," and that she is capable of doing

"general cleaning." (R. 356.) Plaintiff also reported that she does laundry, manages her own money, and drives a car. (Id.) Concerning social functioning, plaintiff reported that she did not have "too many friends," but does attend religious ceremonies. (Id.) She denied hobbies or interests; instead, she "spends her days watching TV." (Id.) Finally, plaintiff described her family relationships, which she deemed "good sometimes and sometimes . . . not." (Id.)

With respect to plaintiff's ability to function at work, Dr. Ortiz found "no evidence of limitation in [plaintiff's] ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain [a] regular schedule, and learn a new task." (Id.) Dr. Ortiz did note "mild limitations in [plaintiff's] ability to perform complex tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress." (R. 356-57.) Dr. Ortiz concluded that plaintiff's "difficulties," though consistent with her psychiatric problems, did not "appear to be significant enough to interfere with [her] ability to function on a daily basis." (R. 357.) She recommended "psychiatric treatment as currently provided" as well as "individual psychological therapy." (Id.)

### III. APPLICABLE LAW

#### a. Standard of Review

Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the pleadings only if he establishes that, based on the pleadings, he is entitled to judgment as a matter of law. Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).

District court review of the Commissioner's final decision denying disability benefits is limited.  A court may not review the Commissioner's decision de novo.  See Cage v. Comm'r of Soc. Servs., 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted).  If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . ."); see also Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).  A court's review thus involves two levels of inquiry.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). First, the court must review "whether the Commissioner applied the correct legal standard," id., including adherence to applicable regulations, see Kohler, 546 F.3d at 265.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence.  Tejada, 167 F.3d at 773.

An ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (quoting Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).  An ALJ's factual findings supported by substantial evidence are "binding" on a district court; however, "where an error of law has been made that might have affected the disposition of the case," the court cannot simply defer to the ALJ's factual findings.  Id.

In a social security case, the phrase "substantial evidence" "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  It is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." Brault v. Comm'r of Social Sec., 683 F.3d 443, 448 (2d Cir. 2012).  "[G]enuine conflicts in the medical evidence are for the Commissioner to resolve."

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted). In particular, courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe the witnesses' demeanor while testifying. Yellow Freight Sys. Inc. v. Reich, 38 F.3d 76, 81 (2d Cir. 1994); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

### b.  Five-Step Disability Determination

The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act provides that "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."
42 U.S.C. § 423(d)(2)(A). "[W]ork which exists in the national economy" "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); see also 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the SSA. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described this analysis as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] considers whether

the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (brackets and omission in original)).  The claimant bears the burden of proof for the first four steps; the burden shifts to the Commissioner at the fifth step.  See Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).

"In making his determination by this process, the Commissioner must consider four factors: (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam) (citation and quotation marks omitted).  Further, the Commissioner "shall consider the combined effect of all the individual's impairments . . . ." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

c. Treating Physician Rule

Under applicable regulations, the opinion of a claimant's treating physician regarding "the nature and severity of [claimant's] impairment[s]" will be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Burgess, 537 F.3d at 128 (citations omitted).  In contrast, a treating physician's opinion is not given controlling weight when the opinion is inconsistent with other substantial evidence in the record, such as the opinions of other medical experts.  20 C.F.R. § 404.1527(d)(2); Snell, 177 F.3d at 133.  In such a case, a report from a consultative physician may constitute substantial evidence.  Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983).  If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so.  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

       If not afforded controlling weight, a treating physician's opinion is given weight according to a number of factors, including, inter alia, (i) the frequency of examinations and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the physician has a relevant specialty.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Clark, 143 F.3d at 118.

       The opinion of a treating physician, or any doctor, that the claimant is "disabled" or "unable to work" is not controlling.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  Medical opinions on such controlling issues are merely a consideration and not determinative.  20 C.F.R. § 404.1527(e).  These are issues reserved to the Commissioner, but that "does not exempt [the ALJ] from [his] obligation . . . to explain why a treating physician's opinions are not being credited."  Snell, 177 F.3d at 134.

IV. THE ALJ'S FINDINGS ARE SUPPORTED BY SUBSTANTIAL
    EVIDENCE AND FREE FROM LEGAL ERROR

Applying the sequential five-step process for evaluating disability claims, the ALJ found plaintiff not disabled within the meaning of the Act and therefore denied her benefit claims. (R. 16-23.) First, the ALJ determined that plaintiff had not engaged in substantial employment since July 1, 2010, the alleged onset date of impairment. (R. 16; see also 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq.) The ALJ noted that although plaintiff worked part-time after the alleged disability onset date, her work activity did not constitute "substantial gainful activity" as defined by the Act. (R. 16; see also 20 C.F.R. §§ 404.1572(a), 416.972(a), 404.1572(b), 416.972(b).) The ALJ's step one finding was consistent with the plaintiff's testimony and her reported earnings. (R. 16, 59-60.)

At the second step of the analysis, the ALJ determined that plaintiff suffered from the following severe impairments: major depression, anxiety disorder, and personality disorder, NOS. (R. 16; see also 20 C.F.R. §§ 404.1520(c), 416.920(c).) The ALJ further noted that plaintiff suffered from non-insulin-dependent ("diet controlled") diabetes mellitus, but because the record reflected no limitations connected with this physical condition—indeed, plaintiff herself reported no physical limitations stemming from this condition (R. 228-30)—the ALJ deemed it non-severe. (R. 17; see also R. 376-404, 462-68.)

Third, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. 17-18.) Specifically, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of Listing 12.04 (Affective Disorders), 12.06 (Anxiety Related

Disorders), or 12.08 (Personality Disorders).  (R. 17.)  In so concluding, the ALJ applied the "special technique" used to evaluate mental impairments, as is required by the Commissioner's regulations.  (R. 17-18; see also 20 C.F.R. §§ 404.1520a, 416.920a.)

Fourth, the ALJ determined that plaintiff was unable to perform her past relevant work as a telemarketer.  (R. 21.)  Specifically, the ALJ concluded that because plaintiff's RFC "limited her to simple unskilled tasks in a low stress workplace . . . [with] no more than occasional interaction with the public or coworkers," she could no longer work as a telemarketer, a job that requires frequent interaction with others.  (R. 18, 21.)

Finally, the ALJ determined that although plaintiff was incapable of performing any past relevant work, she could perform other jobs that exist in significant numbers in the national economy, and was therefore not disabled.  (R. 22-23.)  In so concluding, the ALJ considered plaintiff's age, education, work experience, and RFC, in conjunction with the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  (R. 22.)  The ALJ acknowledged that plaintiff's ability to perform work at all exertional levels had been compromised by her limitations, but noted: "these limitations have little or no effect on the occupational base of unskilled work at all exertional levels."  (R. 23.)

a.  The ALJ Afforded Proper Weight to the Treating Psychiatrist's Opinions

Plaintiff argues that the ALJ "violated the treating physician rule" by failing to afford proper weight to the opinions of plaintiff's treating psychiatrist, Dr. Gerardo Posada. (Pl. Mem. 13-14.)  True, Dr. Posada asserted in a "check-the-box" style questionnaire that plaintiff had numerous "marked limitations," and was unable to tolerate even "low stress" work. (R. 429-31, 432.)  But, as will be developed, the ALJ acted within his discretion when he deemed

this opinion unpersuasive. (R. 22.) The ALJ permissibly afforded Dr. Posada's September 4 assessment "little weight" because it contravened the evidence as whole, including certain positive conclusions found in Dr. Posada's own notes and observations, as well as the consultative examination report. (Id.)

In reviewing Dr. Posada's treatment notes, the ALJ encountered internally inconsistent opinions issued within months of each other. (R. 18-19.) For example, in his initial evaluation, Dr. Posada noted that plaintiff appeared effectively medicated, and he assessed a GAF score of 59, indicating only moderate mental limitations. (R. 336-37.) The ALJ emphasized: "at that point, the claimant stated that she found her medication was helpful with the anxiety and stress from her job." (R. 18.)

Further, on May 16, 2013, Dr. Posada prepared a thorough narrative functional capacity assessment, in which he reported that plaintiff could care for herself on a daily basis and work part-time. (R. 331.) Again, the ALJ emphasized Dr. Posada's positive conclusions regarding plaintiff's impairments, especially noting: "claimant has been stable psychiatrically during the past five years . . . [and has] been under the same medications for the past 12 years with fair results." (R. 19.) Significantly, the ALJ considered Dr. Posada's May 16 notes concerning plaintiff's ability to work. (Id.) The ALJ stressed that although plaintiff's "ability to function at work was limited in so far as [she] had constant difficulty getting along with people, and accepting supervision . . . [Dr. Posada] opined that the claimant could function in a restricted almost isolated work environment, doing activities that did not demand high concentration or a high stress level and with limited social interaction or supervision." (Id.)

Later, on September 4, 2013, Dr. Posada completed a standardized "check-the-box" form in which he indicated that plaintiff was "markedly limited" in multiple work-related areas, and all areas of social interaction. (R. 429-31.) The ALJ noted that, according to the September 4 assessment, plaintiff would be "markedly limited" in such areas as performing activities on a schedule, maintaining regular attendance, and working "in coordination with/or proximity to others without being distracted by them." (R. 19.) Significantly, Dr. Posada further opined that plaintiff could not perform even "low stress" work, yet he assessed a GAF score of 59-60, indicating only moderate limitations, and one point shy of mild-level symptoms. (R. 425, 432; see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 34 (4th ed. rev. 2000).)

When plaintiff followed-up with Dr. Posada on October 21, 2013—less than two months after he issued his extreme September 4 assessment—Dr. Posada noted significant improvements in plaintiff's condition. (R. 529.) In particular, he opined that plaintiff was "psychiatrically stable" and that there was "no evidence of severe depressive or anxiety symptoms." (Id.) As the ALJ recognized, plaintiff's "most recent records discuss good symptoms control, good activities of daily living, improved sleep patterns, less irritability and less anxiety." (R. 18.)

To the extent that Dr. Posada opined that plaintiff was unable to perform even low stress work, the determination of whether a claimant is disabled or unable to work is a legal conclusion, and his opinion on the issue is not controlling. See Johnson v. Colvin, 2015 WL 400623, at *8 (S.D.N.Y. Jan. 30, 2015); Snell, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). "Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law."

20 C.F.R. § 416.927(e)(2).  Thus, the ALJ was not required to defer to Dr. Posada's September 4 conclusion about plaintiff's ability to work.

The ALJ properly weighed Dr. Posada's opinions in light of the totality of the evidence.  Dr. Posada's notes consistently stated that medication helped control plaintiff's mental health issues and that she was "psychiatrically stable."  (R. 328, 336, 529.)  And some two months before the hearing, Dr. Posada noted that plaintiff's condition had improved.  (R. 529.) Further, the record does not support Dr. Posada's "check-box" notation that plaintiff deteriorates or decompensates in a work or work-like setting.  Indeed, Dr. Posada repeatedly noted that plaintiff was never psychiatrically hospitalized.  (See R. 328, 336.)  Thus, the ALJ acted within his discretion by giving "little weight" to Dr. Posada's September 4 assessment, which was at odds with both his earlier narrative functional capacity assessment and a subsequent outpatient progress note.  (R. 22.)

The ALJ also properly relied on the conclusions of consultative examiner Dr. Taina Ortiz, who evaluated plaintiff and found no marked limitations in her functioning. (R. 356-57.)  The views of such medical consultants can be afforded significant weight when supported by medical evidence in the record.  20 C.F.R. § 416.927(e).

Dr. Ortiz noted plaintiff's problems sleeping and eating, her struggles with depression and anxiety, and her self-reported memory issues.  (R. 354-55.)  Dr. Ortiz opined that plaintiff was unimpaired with respect to performing simple tasks on her own, maintaining attention and concentration, maintaining a regular schedule, and learning new tasks.  (R. 356.) Dr. Ortiz further assessed only a "mild" limitation in terms of plaintiff's "ability to perform complex tasks, make appropriate decisions, relate adequately with others, and appropriately deal

with stress." (R. 356-57.)  Ultimately, she concluded that plaintiff experienced psychiatric

problems, but that they did not "interfere with [her] ability to function on a daily basis."  (R. 357)

Notably, Dr. Ortiz's findings align with Dr. Posada's May 16 narrative functional capacity

assessment.

The ALJ also relied on plaintiff's GAF score, noting: "[plaintiff's] GAF has

consistently ranged from 51-60, indicative of moderate mental limitations."  (R. 18.)

The ALJ considered the opinions of Dr. Posada in the context of the whole record,

giving weight to medical evidence that both supported and refuted his assessments and

conclusions.  Thus, the ALJ properly exercised his discretion to weigh conflicting evidence in

determining that plaintiff is not disabled and can work.

b.  The ALJ Properly Applied the "Special Technique" for Evaluating
Mental Impairments

The Commissioner requires an ALJ to document application of the "special

technique" used to evaluate mental impairments, and include a specific finding with respect to

the degree of limitation in each of four broad functional areas: activities of daily living, social

functioning, concentration, persistence, or pace, and episodes of decompensation.

20 C.F.R. §§ 404.1520a(c)(3), 404.1520a(e)(4), 416.920a(c)(3), 416.920a(e)(4).

Here, the ALJ's written decision reflects application of the "special technique."

(R. 17.)  Specifically, at step three of the five-step sequential evaluation process, the ALJ

considered whether plaintiff satisfied the "paragraph B" criteria of Listings 12.04 (Affective

Disorders), 12.06 (Anxiety Related Disorders), and 12.08 (Personality Disorders).  (Id.)  To

satisfy "paragraph B," a claimant must show that her impairments result in at least two of the

following: "marked restriction of activities of daily living; marked difficulties in maintaining

23

social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration." (R. 17; see also 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04(B)(1-4), 12.06(B)(1-4), 12.08(B)(1-4).)

Concerning activities of daily living, the ALJ found that plaintiff displayed only a "mild" restriction. (R. 17.) As the ALJ noted, plaintiff's activities of daily living were deemed "intact" by Dr. Posada, and "the claimant was able to take care of herself and work part-time." (R. 19.) Plaintiff's statements supported this finding—after all, she reported that she lives alone, manages her own finances and calendar, drives locally, and shops, cooks, and cleans for herself. (R. 75-78, 356.)

With respect to social functioning, the ALJ found that plaintiff displayed "moderate difficulties," noting that although she "can be irritable and has difficulty getting along with people . . . she is not totally dysfunctional in the social area." (R. 17) Again, substantial evidence supported the ALJ's determination as to social functioning. For example, in a function report plaintiff completed on March 9, 2013, she stated that she spoke to others on the phone daily and attended religions ceremonies weekly. (R. 228.) Moreover, plaintiff was "cooperative," and displayed "adequate" social skills, during her consultative examination. (R. 354.)

As to concentration, persistence, or pace, the ALJ determined that plaintiff displayed "moderate difficulties," noting that her problems concentrating and getting started with daily activities primarily stemmed from distractibility. (R. 17.) This finding was supported by plaintiff's ability to do basic calculations and counting exercises. (R. 356.) Further, the ALJ

emphasized that plaintiff's current work activity indicated a less-than-marked restriction in the area of concentration, persistence, or pace. (R. 17.) Finally, the ALJ concluded that plaintiff experienced no episodes of decompensation, which is supported by the record. (Id.)

Thus, because plaintiff's mental impairments did not result in at least two "marked" limitations, or one "marked" limitation plus repeated episodes of decompensation, the ALJ concluded that plaintiff failed to satisfy the "paragraph B" criteria.[3] (Id.) This conclusion at step 3 was based on a thorough analysis of the record, as is reflected in the ALJ's written decision.

The ALJ properly incorporated the results of his "paragraph B" findings into his RFC findings, which were then used at steps 4 and 5. As the ALJ explained:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(R. 17-18, 18-22; see also SSR 96-8p.) The ALJ relied on Dr. Posada's treatment record as a whole, his May 2013 narrative assessment and October 2013 medical progress note, as well as Dr. Ortiz's opinion, in limiting plaintiff to simple unskilled work in a low stress workplace. (R. 22.)

---

[3] The ALJ also found that plaintiff did not satisfy the "paragraph C" criteria of Listings 12.04 and 12.06. (R. 17.)

Plaintiff further contends that the ALJ, in making his RFC finding, failed to consider the role of plaintiff's difficulties sleeping and concentrating. (Pl. Mem. at 16.) To the contrary, the ALJ acknowledged evidence concerning plaintiff's "difficulty falling asleep and also staying asleep," as well as her "limited concentration." (R. 19.) Significantly, neither "insomnia" or "concentration impairment" appear as distinct diagnoses in any of Dr. Posada's assessments. The ALJ did not ignore this evidence, but instead determined it was not enough to support a greater degree of functional limitation.

The ALJ properly applied and addressed in his written decision the "special technique" required on a claim of mental impairment at step three. The ALJ's RFC finding was also supported by substantial evidence and free from error.

### d.   The ALJ Was Not Required to Consult a Vocational Expert

Plaintiff also contends that the ALJ erred by not consulting a vocational expert when determining if there were jobs in the national economy that plaintiff could perform. Specifically, plaintiff asserts that she suffers from significant nonexertional limitations, precluding the ALJ's exclusive reliance on the Commissioner's Medical Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix II. (Pl. Mem. at 14.)

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)). "A nonexertional limitation 'significantly limit[s]' a claimant's range of work when it causes 'an additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful

employment opportunity.'" Id. at 411. "If, however, a claimant does not have such limitations or impairments, the ALJ may use the Medical Vocational Guidelines (the 'grids') to adjudicate the claim." Woodmancy v. Colvin, 577 F. App'x 72, 76 (2d Cir. 2014) (summary order).

The ALJ found that plaintiff did not display significant nonexertional limitations, and thus permissibly followed the guidance of the grids without obtaining the opinion of a vocational expert. Specifically, the ALJ noted: "The claimant's ability to perform work at all exertional levels has been compromised by her nonexertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all levels." (R. 23.) Substantial evidence supported this conclusion. For example, Dr. Posada opined that plaintiff could function in a low stress workplace with little social interaction or supervision. (R. 331.) And Dr. Ortiz opined: "There is no evidence of limitation in the claimant's ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention or concentration, maintain [a] regular schedule, and learn a new task." (R. 356.) Further, the ALJ emphasized plaintiff's part-time work assisting seniors, noting that the "job of home companion . . . is listed in the dictionary of occupational [titles] (DOT) as semiskilled work (DOT 309.677-010)." (R. 21.) Moreover, Social Security Ruling 85-15 provides:

> Where there is no exertional impairment [as here], unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis.

Therefore, because the ALJ had substantial evidence to determine that plaintiff's nonexertional limitations did not significantly restrict her vocational opportunities, his use of the Medical Vocational Guidelines was permissible.

### e.   The Court Defers to the ALJ's Witness Credibility Findings

SSR 96-7p lists certain factors to be applied when determining the credibility of an individual's descriptions of symptoms of a physical or mental impairment. See 1996 WL 374186 at *1-2.  It requires an applicant's testimony concerning symptoms to be weighed in the context of medically determinable evidence, as well as the entire case record. Id. "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *2. "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." Id. at *4.

The ALJ, and not the reviewing court, has the responsibility to determine the credibility of witnesses. And courts "must show special deference" to "explicit credibility findings . . . ." Yellow Freight Sys., 38 F.3d at 81; see also Snell, 177 F.3d at 135 ("After all, the ALJ is in a better position to decide issues of credibility.").

The ALJ concluded that plaintiff's allegations "concerning the intensity, persistence and limiting effects of [her] symptoms" were "not entirely credible." (R. 21.) He cited several reasons why he deemed plaintiff's statements less-than-wholly credible.

He first pointed to plaintiff's longitudinal treatment history, noting that her symptoms have been "effectively managed with medication for many years." (Id.) The ALJ

further noted that plaintiff has received only outpatient treatment, has never experienced "any serious exacerbation of her mental status other than the one suicidal ideation expression which was subsequently reported as not being serious," and, at the time of the hearing, saw her psychiatrist only every three months, and only for medication management. (Id.) Reviewing this evidence on the whole, the ALJ concluded that plaintiff's "level of treatment does not reflect a disabling level of mental symptomology as alleged." (Id.)

Second, the ALJ noted plaintiff's long history of taking the same mental health medications without issue. (Id.) The ALJ next directed his credibility assessment towards plaintiff's ability to work, noting that her work assisting seniors, though not substantial employment, was "fairly close" to substantial employment, which constituted "evidence of a greater residual functional capacity [than] alleged." (Id.)

Last, the ALJ emphasized plaintiff's continued ability to care for herself on a daily basis. (Id.) Putting it all together, the ALJ concluded: "Although it is apparent that the claimant has long-standing emotional issues, the evidence does not show that she is altogether dysfunctional from a mental standpoint to the extent alleged." (Id.)

The ALJ was in the best position to measure plaintiff's credibility, and he rendered "explicit credibility findings" supported by the evidence of record. Thus, the ALJ's credibility findings are free from legal error, and this Court defers to his conclusions regarding the credibility of plaintiff's testimony.

### V. CONCLUSION

The ALJ's findings are free from legal error and supported by substantial evidence. The Commissioner's decision is affirmed.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
August 21, 2015